IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| D.C.<br><br>Plaintiff,<br><br>v.<br><br>JENNIFER HASRATIAN; TONY HASRATIAN; PAULA HASRATIAN; EL MATADOR, INC.; EL MATADOR RESTAURANTE & CANTINA; EL MATADOR RESTAURANT; TONY HASRATIAN LIVING TRUST, DATED MARCH 16, 1995; PAULA HASRATIAN LIVING TRUST, DATED MARCH 16, 1995; and DOES 1 through 50, inclusive,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT<br><br>Case No. 1:14-cv-00175-JNP-EJF *SEALED*<br><br>District Judge Jill N. Parrish |

Before the court are two motions for summary judgment brought by most of the defendants in this case. Defendants El Matador, Inc., El Matador Restaurante & Cantina, and El Matador Restaurant[1] (collectively, El Matador) bring a motion for summary judgment (Docket 60) as to D.C.'s first cause of action for negligence; fifth cause of action for sexual harassment, hostile work environment, and retaliation; sixth cause of action for constructive wrongful discharge; and seventh cause of action for negligent infliction of emotional distress. Defendants Tony Hasratian, Paula Hasratian, the Tony Hasratian Living Trust, and the Paula Hasratian Living Trust  (collectively, the Hasratians) bring a separate motion for summary judgment

---

[1] The plaintiff alleges that El Matador Restaurante & Cantina and El Matador Restaurant are DBAs of El Matador, Inc.

(Docket 59) as to D.C.'s first cause of action for negligence and seventh cause of action for negligent infliction of emotional distress.

The court GRANTS IN PART AND DENIES IN PART El Matador's motion for summary judgment. The court GRANTS the Hasratians' motion for summary judgment.

## BACKGROUND

Tony Hasratian and Paula Hasratian founded the El Matador restaurant in 1963 or 1964. Tony and Paula are officers in El Matador, Inc. and Tony still makes management decisions for the restaurant. In 2013, their 39-year-old daughter, Jennifer Hasratian, was a manager of El Matador. Tony and Paula had also given Jennifer around 20 or 30 percent of the shares in El Matador Inc., and she was an officer in the corporation.

Jennifer lived in a condo. Tony and Paula lived in a separate home. Tony and Paula's home had an office where another daughter regularly performed bookkeeping duties for the restaurant. The home office also had monitors linked to security cameras at the restaurant so that individuals could see what was going on there. Tony and Paula had given Jennifer a key and the security codes to their home. When Tony and Paula were out of town, Jennifer would occasionally pick up the mail and generally look after her parents' home.

In March and April of 2013, 16-year-old D.C. and several of his friends began hanging out with Jennifer at her condo. He stayed the night there on a couple of occasions. Jennifer would give alcohol to D.C. and his friends when they came over. She acquired at least some of this alcohol by taking it from the restaurant.

In early May, Jennifer gave D.C. a job at El Matador as a dishwasher. On one occasion, Jennifer gave D.C. alcohol while he was at work. Around two weeks after D.C. started working

at the restaurant, D.C. was drinking alcohol with his friends and Jennifer at her condo. He became intoxicated and passed out on a bed. He awoke to Jennifer unzipping his pants and engaging in oral sex with him. She then engaged in vaginal sex with him before he passed out again. Thereafter, Jennifer provided alcohol to and engaged in sexual activity with D.C. on multiple occasions at her condo. Jennifer also had sex with D.C. in Tony and Paula's home on several occasions when Tony and Paula were out of town.

D.C. testified that Jennifer's sexual relationship with him "really messed up [his] head for a while." [D.C. dep., p.160] In July, D.C. attempted suicide and was hospitalized on several occasions. While D.C. was in the hospital for the second time after a suicide attempt, Jennifer sent a text message to D.C.'s mother. It stated that if D.C. didn't make it to work that evening, he would be replaced. Based on this text message, he never returned to work and considered his employment to be over. When D.C. was hospitalized for a third time, a nurse observed inappropriate intimate contact between D.C. and Jennifer. D.C.'s mother subsequently discovered several sexually charged text messages from Jennifer on D.C.'s cell phone. Based upon this information, D.C.'s mother called the police. D.C. admitted to the sexual relationship and cooperated with the ensuing investigation of Jennifer's criminal sexual activity.

D.C. sued Jennifer, Tony, Paula, Tony and Paula's trusts, and El Matador under various theories of liability. El Matador has moved for summary judgment on D.C.'s negligence, negligent infliction of emotional distress, hostile work environment, and wrongful termination claims. Tony, Paula, and their respective trusts have moved for summary judgment on D.C.'s negligence and negligent infliction of emotional distress claims.

## APPLICABLE LAW AND LEGAL STANDARDS

A federal court exercising supplemental jurisdiction over state-law claims "applies the substantive law, including choice of law rules, of the forum state." *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (citation omitted). The court, therefore, applies Utah's substantive law to D.C.'s negligence, negligent infliction of emotional distress, and wrongful discharge claims. Federal law applies to D.C.'s hostile work environment claim because it is based on a federal statute.[2]

Regardless of whether Utah or federal law applies to a claim, this court applies federal law when determining whether summary judgment is appropriate under rule 56 of the Federal Rules of Civil Procedure. *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1076 (10th Cir. 2007). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). On a motion for summary judgment, the court "consider[s] the evidence in the light most favorable to the non-moving party." *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013) (citation omitted). However, "[w]hen the moving party has carried its burden under rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where

---

[2] In his complaint, D.C. also alleged a hostile working environment claim under a Utah statute. Because El Matador neither argues why summary judgment is appropriate for this Utah claim, nor asserts that the Utah hostile work environment law is functionally the same as the federal law, this court does not address D.C.'s state law claim.

4

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (alterations in original) (citation omitted).

## ANALYSIS

### I.    Negligence and Negligent Infliction of Emotional Distress

D.C.'s first cause of action alleges that all of the defendants are liable in negligence for Jennifer Hasratian's acts of providing alcohol to D.C. and engaging in criminal sexual relations with him. "In order to prevail in an action for negligence, a plaintiff must prove that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused (4) the plaintiff to suffer legally compensable damages." *Cope v. Utah Valley State Coll.*, 342 P.3d 243, 248 (Utah 2014).

In D.C.'s seventh cause of action, he alleges that all of the defendants are liable for negligent infliction of emotional distress. Under this claim, an individual is liable if he or she unintentionally causes emotional distress to another resulting in illness or bodily harm. *Carlton v. Brown*, 323 P.3d 571, 585 (Utah 2014). The plaintiff must prove that the defendant (1) "should have realized that his conduct involved an unreasonable risk of causing the distress" and (2) "from the facts known to him, should have realized that the distress, if it were caused, might result in illness or bodily harm." *Id.* (citation omitted).

El Matador and the Hasratians filed separate motions for summary judgment on D.C.'s negligence and negligent infliction of emotional distress claims. The court will address each motion in turn.

A.  El Matador's Summary Judgment Motion

    1)  *Respondeat Superior* Liability

D.C. asserts that El Matador is liable for both negligence and negligent infliction of emotional distress because of the actions of its agent, Jennifer Hasratian, in furnishing alcohol and engaging in illegal sexual activity with him. These claims rest upon a theory of *respondeat superior* liability.

*Respondeat superior* liability arises when an agent commits a tort while "acting within the scope of employment." RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006). But if "an agent's act occurs within 'an independent course of conduct' not connected to the principal," the principal is not liable for the agent's tort. *M.J. v. Wisan*, 371 P.3d 21, 30 (Utah 2016) (citation omitted). The Utah Supreme Court has identified three factors relevant to a determination of whether an agent is acting within the scope of employment: "(1) whether the agent's conduct is 'of the general kind the [agent] is employed to perform'; (2) whether the agent is acting 'within the hours of the [agent's] work and the ordinary spatial boundaries of the employment'; and (3) whether the agent's acts were 'motivated, at least in part, by the purpose of serving the [principal's] interest.'" *Id.* at 31 (alterations in original) (citation omitted).

"As a general rule, the issue of whether an employee acted within the scope of employment is a factual question to be decided by the trier of fact." *Birkner v. Salt Lake County*, 771 P.2d 1053, 1057 (Utah 1989). "Some conduct, however, is so clearly outside the scope of employment that the issue may properly be decided by the trial judge as a matter of law." *Id.* In several instances, the Utah Supreme Court has held that an agent's sexual misconduct did not trigger respondeat superior liability as a matter of law because the conduct was clearly beyond

the scope of employment. *Jackson v. Righter*, 891 P.2d 1387, 1391 (Utah 1995) (an employee's affair with another employee "was so clearly outside the scope of his employment that reasonable minds could not differ"); *J.H. ex rel. D.H. v. West Valley City*, 840 P.2d 115, 123 (Utah 1992) (plurality opinion) ("[R]easonable minds could not differ in determining that the touching or molestation [of a minor] was not within the general nature of work [a police officer] was hired to perform."); *Birkner*, 771 P.2d at 1058–59. (a social worker's sexual relationship with a client "was outside the scope of his employment as a matter of law").

But the Utah Supreme Court has recently rejected the notion that the sexual misconduct of an agent is always outside the scope of employment as a matter of law. In *M.J. v. Wisan*, the court had to decide whether the trustee of a trust that had been established for "the express purpose of furthering the doctrines of the FLDS Church, including the practice of plural marriage involving underage girls," acted outside the scope of his agency relationship when the trustee arranged a marriage between an adult and an underage girl. 371 P.3d at 23–24, 25. The court reasoned that given the trustee's "unique role as leader of the FLDS Church, and in light of the unusual, troubling function of plural marriage involving young brides in the FLDS culture," it could not conclude as a matter of law that the trustee was acting outside the scope of his agency relationship by directing an adult to marry and have sexual relations with a minor. *Id.* at 33. Under "these unusual circumstances," the court held that it could not conclude as a matter of law that the trustee "had no purpose of advancing the interests of the Trust[,] . . . however misguided those interests may seem." *Id.*

Applying the three-factor scope-of-employment test to this case, the court concludes that the undisputed facts presented here are similar to those presented in *Birkner*, *J.H. ex rel. D.H.*, and *Jackson* and dissimilar to those in *M.J.* First, knowingly giving alcohol to a minor at no

charge[3] and engaging in illegal sexual activity with him is not the general kind of conduct that El Matador hired Jennifer to perform. These activities were not "closely connected with what [Jennifer was] employed to do." *Birkner*, 771 P.2d at 1056.

Second, some of Jennifer's misconduct occurred during work hours. On one occasion, she furnished alcohol to D.C. at work. She also left the restaurant with D.C. on several occasions in order to have sex with him and told him not to clock out. But misconduct occurring during work hours and on work property does not tip the scales in favor of *respondeat superior* liability if the misconduct is not related to employment duties. *See Jackson*, 891 P.2d at 1391 (finding no *respondeat superior* liability despite the fact that a sexual relationship "occurred within the hours and spatial boundaries of his employment"); *J.H. ex rel. D.H.*, 840 P.2d at 123 (finding no *respondeat superior* liability despite the fact that "molestations occurred within the general spatial and time limitations of [the agent's] employment"); *Birkner*, 771 P.2d at 1058 ("Although [an agent's] misconduct took place during, or in connection with, therapy sessions [during work hours], it was not the general kind of activity a therapist is hired to perform.").[4]

And third, there is no indication that Jennifer's acts were motivated in any way to serve El Matador's interest. Instead, furnishing alcohol at no charge and engaging in illegal sexual conduct furthered her selfish personal gratification. *See Jackson*, 891 P.2d at 1391 (agent's

---

[3] El Matador is in the business of selling alcoholic beverages. If Jennifer had sold alcohol to a minor, this factor may have gone the other way.

[4] In *M.J.*, the Utah Supreme Court modified its analysis of this second factor. Noting that "in today's business world much work is performed for an employer away from a defined work space and outside of a limited work shift" the court held that "an agent need not be acting 'within the hours of the employee's work and the ordinary spatial boundaries of the employment' in order to be acting within the course of his employment." *M.J.*, 371 P.3d at 32 (citation omitted). Jennifer's misconduct outside of work hours, however, cannot be characterized as working remotely or furthering of her work duties.

motives for conducting an affair with a coworker "were entirely personal and were in no way directed at the accomplishment of [the principals'] interests"); *J.H. ex rel. D.H.*, 840 P.2d at 1239 (agent "committed the acts [of molestation] for his own personal gratification"); *Birkner*, 771 P.2d at 1058 (sexual contact "was not to further the employer's interest, but only a personal interest").

Moreover, the facts of this case bear no resemblance to the "unique circumstances" found in the *M.J.* opinion. Unlike the trust in that case, which arguably promoted sexual relations between adults and minors, there is no indication that El Matador hired Jennifer to have sex with underage employees. The court concludes, therefore, that Jennifer's actions were so clearly outside the scope of her agency relationship that El Matador is not subject to *respondeat superior* liability for Jennifer's misconduct as a matter of law.

2) Negligent Supervision and Retention

In addition to alleging vicarious liability for Jennifer's actions, D.C. also alleges that El Matador is directly liable for negligently supervising Jennifer and preventing her harmful behavior towards an underage coworker. The Utah Supreme Court has adopted the rule found in section 317 of the Restatement (Second) of Torts for determining when a principal has a duty to prevent an agent from harming another. *Graves v. N. E. Servs., Inc.*, 345 P.3d 619, 626 (Utah 2015). Section 317 provides:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant

> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>
> (ii) is using a chattel of the master, and
>
> (b) the master
>
> (i) knows or has reason to know that he has the ability to control his servant, and
>
> (ii) knows or should know of the necessity and opportunity for exercising such control.

RESTATEMENT (SECOND) OF TORTS § 317 (1965).

Applying this test, the court first examines D.C.'s argument that El Matador had a duty to prevent Jennifer from engaging in illegal sexual conduct with him. Under the initial inquiry of section 317, none of this conduct occurred on El Matador's premises, at a location where Jennifer had access because of her agency relationship with El Matador, or while using a chattel belonging to El Matador. All of the sexual acts occurred either at Jennifer's home or her parent's residence. D.C. has presented evidence that the Hasratian residence has an office in the basement where El Matador business, such as bookkeeping and monitoring of surveillance cameras, is conducted. But regardless of whether the home office would be considered "a premises in possession" of El Matador, the entire home would not attain this status. Because Jennifer's tortious sexual conduct occurred in the living quarters of the Hasratians' home and not in the home office, El Matador had no duty to control Jennifer's harmful behavior.

Next, the court examines D.C.'s assertion that El Matador had a duty to prevent Jennifer from providing alcohol to him. D.C. has presented evidence that on one occasion Jennifer gave him alcohol at the restaurant. In addition, there is some evidence that Jennifer took alcohol

belonging to El Matador and gave it to D.C. at her home. Thus, D.C. provided evidence that Jennifer was "using a chattel of the master" when she furnished him alcohol in her home.

Under the second step of section 317, however, there is no indication that El Matador knew or should have known of a need to control Jennifer's conduct related to providing alcohol to minors. D.C. presented evidence of her parent's knowledge that Jennifer had problems with her own consumption of alcohol in the past, including DUI arrests and car accidents caused by intoxication. But there is no evidence that El Matador knew or had reason to know that Jennifer was giving alcohol to minors at work or that she was stealing alcohol so that she could provide it to a minor.

Because there is no evidence before the court that could satisfy all of the requirements of section 317, El Matador is entitled to summary judgment on D.C.'s negligent supervision claim.

3) Direct Liability for Negligent Infliction of Emotional Distress

Finally, D.C. has presented no argument or evidence to support a theory of direct liability for negligent infliction of emotional distress against El Matador. There is no evidence that an El Matador agent operating within the scope of his or her employment engaged in any extreme conduct that "involved an unreasonable risk of causing the distress." *Carlton*, 323 P.3d at 585 (citation omitted).

In sum, because D.C. has not presented evidence that would support either a negligence claim or a negligent infliction of emotional distress claim against El Matador, it is entitled to summary judgment as to these causes of action.

B.  The Hasratians' Summary Judgment Motion

D.C. alleges that the Hasratians are liable for their daughter's misconduct under two broad theories. First he argues that because the Hasratians gave Jennifer a key to their house,

11

Jennifer became the Hasratians' agent and they are liable for Jennifer's misconduct with D.C. while they were in the home. Second, D.C. alleges that he was an invitee to the Hasratian's home and that they are liable under a premises liability theory.

1) Agency Theory of Liability

The Hasratians gave Jennifer a key and access codes to their home so that she could pick up the mail and watch over the house when they were gone. On several occasions, Jennifer brought D.C. to the Hasratians' home while they were out of town. While they were in the residence, Jennifer gave D.C. alcohol and engaged in illegal sexual activity with him. D.C. argues that Jennifer became the Hasratians' agent while they were out of town, and that they are therefore subject to *respondeat superior* liability for her actions while inside the home.

This court need not determine whether Jennifer became an agent for the Hasratians because she acted outside the scope of any potential agency relationship. As discussed above, a principal is only liable when the agent is acting within the scope of the agency relationship. *M.J.*, 371 P.3d at 30–31. The only agency relationship that could arguably exist here related to picking up mail and watching over the house in the Hasratians' absence. Providing alcohol to and having sex with a minor would be outside the scope of any such agency relationship. Instead, these acts served only Jennifer's personal gratification. *See Jackson*, 891 P.2d at 1391; *J.H. ex rel. D.H.*, 840 P.2d at 1239; *Birkner*, 771 P.2d at 1058.

2) Premises Liability Theory

Although poorly developed in his briefing, D.C. raises in passing that the Hasratians are subject to premises liability for the psychological injuries he suffered at Jennifer's hands while in the Hasratian home. Under a premises liability theory, a "possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land." *Hale v. Beckstead*, 116 P.3d

12

263, 266 (Utah 2005) (quoting RESTATEMENT (SECOND) OF TORTS § 343 (1965)). But D.C. has failed to identify a dangerous condition of the Hasratians' property or any physical harm caused by such a condition. D.C.'s premises liability theory, therefore, fails as a matter of law.

Because both D.C.'s agency and premises liability theories are unavailing, the court grants summary judgment for the Hasratians and their trusts as to the negligence cause of action and the negligent infliction of emotional distress claims.

## II.      Hostile Work Environment and Retaliation Claims

### A. Hostile Work Environment

Title VII makes it unlawful for an employer to "discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To establish a hostile work environment claim under this statute, a plaintiff must show that "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (alteration in original) (citation omitted).

"For a hostile environment claim to survive a summary judgment motion, 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (citation omitted). "[T]he plaintiff must make a showing that the environment was both objectively and subjectively hostile . . . ." *Id.*

13

El Matador argues that summary judgment on D.C.'s hostile work environment claim is appropriate for two reasons. First, it argues that Jennifer's actions were not severe or pervasive enough to create an abusive working environment. Second, it argues that El Matador cannot be held liable because it did not have actual or constructive knowledge of Jennifer's actions.

### 1) Severity and Pervasiveness of Jennifer's Conduct

El Matador points to evidence that Jennifer never touched D.C. inappropriately while he was at the restaurant and that the only possible inappropriate behavior on Jennifer's part was "innocent flirting." El Matador argues that this evidence could not be interpreted as creating a hostile work environment as a matter of law because it was not severe or pervasive.

El Matador's rather limited view of the scope of the evidence of a hostile working environment appears to be premised upon an assumption that any actions that Jennifer took towards her subordinate outside of work could not contribute to a hostile working environment. "But harassment does not have to take place within the physical confines of the workplace to be actionable; it need only have consequences in the workplace." *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008); *see also Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991) ("We believe that in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment.").[5]

---

[5] The Fifth Circuit has rejected a hostile work environment claim based upon alleged harassment that occurred outside of work hours. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003). In that case, an emergency room worker contracted hepatitis C and took a two-year leave of absence from work. *Id.* at 506. She later told her supervisors that she wanted to return to her work in the emergency room. *Id.* Her supervisors expressed doubts as to whether she could safely work in an emergency room and placed conditions upon her return. *Id.* at 506–07. The employee never returned to work and sued the hospital for a hostile working environment. *Id.* at 507. The Fifth Circuit affirmed summary judgment in favor of the hospital, reasoning that the supervisors' communications to the plaintiff setting the conditions of her return did not constitute

There is evidence here that Jennifer gave alcohol to D.C. at her home and that he became drunk and passed out on a bed. [D.C. dep., p. 48] D.C. woke up to Jennifer unzipping his pants and engaging in oral sex with him. Jennifer engaged in illegal sexual conduct with D.C., a minor, many times thereafter outside of work. D.C. felt awkward about having sex with his boss, and she seemed upset when he told her no. [D.C. decl. ¶ 17]  He was also worried that if Jennifer became upset with him she would "take it out on [him] at work." [D.C. decl. ¶ 19]

Based on this evidence, there is a dispute of material fact as to whether Jennifer's conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry*, 155 F.3d at 1261 (citation omitted). A jury could find that Jennifer's statutory rape of D.C. outside of work was severe enough to create an abusive environment while he was at work. *See Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 743 (10th Cir. 2014) ("[R]ape is inarguably a severe form of sexual harassment . . . ."); *Lapka*, 517 F.3d at 983 ("Rape is also, by definition, a form of harassment based on sex.").

In addition, D.C. states in his declaration that Jennifer made sexual comments to him at work, including "It's hard to work with you because I want to f--k you." [D.C. decl., ¶ 14.]

---

harassment. *Id.* at 510. The court also noted that most of the allegedly harassing communications occurred outside of work via telephone or in writing and did not affect her working environment. *Id.* at 510–11. *Goweski* is readily distinguishable from both this case and authorities from other circuits that hold that out-of-work harassment can lead to a viable claim if it affects the workplace. The *Goweski* court noted that the plaintiff never returned to work after the allegedly harassing statements were made. *Id.* Thus, it was impossible for the allegedly harassing behavior to affect the plaintiff's work environment because she never returned to work. The facts presented in *Goweski* are different from the facts of this case, where D.C. worked with Jennifer after the alleged out-of-work harassment occurred.

Viewed in the light most favorable to D.C., this evidence also supports a hostile work environment claim.[6]

### 2) El Matador's Knowledge of a Hostile Working Environment

When a hostile work environment claim is based upon an employer's negligence or recklessness in failing to stop sexual harassment on the part of a coworker, "the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998) (citation omitted). El Matador seizes upon this legal principle and argues that it cannot be liable for a hostile work environment as a matter of law because there is no evidence that El Matador had actual or constructive knowledge of Jennifer's inappropriate behavior.

El Matador's argument, however, ignores the distinction between cases involving sexual harassment by a coworker and cases involving sexual harassment by a supervisor. "If the harasser is a supervisor rather than merely a co-worker, . . . the employer may be vicariously liable for the conduct, depending on the circumstances." *Kramer*, 743 F.3d at 737. "If the supervisor's harassment culminates in a 'tangible employment action,' the employer is strictly liable for sex discrimination, with no defense." *Id.* (citation omitted). "If no tangible employment action occurs, the employer may still be vicariously liable for the supervisor's harassment if the plaintiff proves the harassment was severe or pervasive, and the employer is unable to establish

---

[6] At oral argument, El Matador suggested that the court disregard much of D.C.'s declaration because it contains factual allegations that were not made during his deposition. But this court may only ignore a declaration if it contradicts earlier deposition testimony. *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 956 n.3 (10th Cir. 2012). Including information in a declaration that was not mentioned during a deposition is not the same as contradicting prior deposition testimony.

the affirmative defense announced in *Faragher v. City of Boca Raton* . . . ." *Id.* (citation omitted). "This defense has 'two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.' " *Id.* at 745 (citation omitted).

There is ample evidence in this case that Jennifer was D.C.'s supervisor. She was a manager of El Matador. She hired D.C., and she threatened to fire him if he did not work his shift during his second hospitalization. El Matador, however, has not argued that it is entitled to summary judgment under a supervisor liability analysis. It has not addressed whether there is evidence that D.C. was subjected to a tangible employment action, nor has it argued that it had a sexual harassment policy or that D.C. unreasonably failed to take advantage of such a policy.

Because El Matador has neglected to make any argument regarding supervisor liability, it is not entitled to summary judgment. Even if it could show that there is no evidence that it knew about Jennifer's inappropriate behavior, it has failed to demonstrate that it would avoid liability as a matter of law if Jennifer is deemed to be a supervisor.

Thus, both of El Matador's arguments for summary judgment on the federal hostile work environment claim fail. El Matador's motion for summary judgment on this claim is denied.

B.  Retaliation

"A plaintiff establishes a prima facie case of retaliation by showing: (1) he or she engaged in protected opposition to discrimination; (2) he or she was subject to adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000).

17

D.C. argues that he engaged in protected opposition to discrimination by cooperating with the police investigation into Jennifer's illegal sexual conduct towards him. He also argues that when his mother told Jennifer that she "had some explaining to do" to the police that she was opposing discrimination on behalf of her minor son. [Pl. exh. 7, ¶ 12] D.C. further asserts that he was subjected to an adverse employment action by being terminated from his employment when Jennifer subsequently sent his mother a text stating: "Tell your crazy kid to leave me alone." [Pl. exh. 7, ¶ 14] D.C. contends that this text message was a constructive dismissal from his employment caused by protected opposition to discrimination.

El Matador argues, however, that there is no causal link between a protected activity and an adverse employment action in this case because the undisputed evidence shows that D.C. either quit or was fired before the police investigation began and before D.C.'s mother threatened Jenifer on behalf of her son. D.C. testified in his deposition that during his second hospitalization for attempting suicide Jennifer sent D.C.'s mother a text message stating that he had to be at work that night or he would be replaced. [D.C. dep., p. 180] D.C.'s mother told D.C. about the text message, but because of his hospitalization he could not go to work that evening. [D.C. dep., p. 180] D.C. testified that based upon this text message, he never went back to work. [D.C. dep., p. 181] He further confirmed that his employment "ended around July 22nd of 2013," the date of his second hospitalization.[7] [D.C. dep., pp. 14, 85] D.C.'s cooperation with the police investigation and his mother's threat to Jennifer that she had some explaining to do occurred after Jennifer's sexual abuse came to light some time later during a third hospitalization. D.C.'s deposition testimony, therefore, demonstrates that there can be no causal link between the

---

[7] Notably, D.C. also alleged in his complaint that he was constructively terminated from his employment on or about July 22, 2013. [Compl. ¶ 103]

protected activity of reporting Jennifer's criminal behavior and an adverse employment action because he was no longer an employee when he engaged in the protected activity.

After his deposition, D.C. produced a declaration that proffered a different timeline for the termination of his employment at El Matador. The declaration states that after D.C. participated in the police investigation, Jennifer sent a text message to his mother stating: "Tell your crazy kid to leave me alone." [D.C. decl., ¶ 37] D.C. further declared:

> Jennifer Hasratian's communications, including "Tell your crazy kid to leave me alone", was [sic] understood and in context of the discussions [sic] that my employment at El Matador was terminated by El Matador through Jennifer Hasratian. I did not voluntarily quit my employment at El Matador.
>
> Jennifer Hasratian's and El Matador's "Tell your crazy kid to leave me alone" and termination of my employment was in retaliation for [D.C.'s mother] having confronted Jennifer Hasratian and El Matador including on my behalf complaining to her and El Matador about the sexual text messages . . . and making complaints to the Ogden City Police Department about the unlawful sexual harassment, hostile work environment, and unlawful sexual activity with me, a minor.

[D.C. decl., ¶¶ 38–39]  The declaration did not address or attempt to explain D.C.'s statements in the deposition that his employment with El Matador came to an end on an earlier date.

In order to determine whether D.C. has produced viable evidence that would create a dispute of material fact as to whether he was fired after he cooperated with the police investigation, the court must decide whether to disregard his declaration under the sham affidavit rule. Under this rule, a court may disregard an affidavit that contradicts prior deposition testimony. *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014). But a "witness' affidavit will not be automatically excluded because it conflicts with the witness' earlier or later [testimony]." *S.E.C. v. Smart*, 678 F.3d 850, 856 n.6 (10th Cir. 2012) (alteration in

original) (citation omitted). The court must also weigh three factors to determine if the affidavit constitutes an attempt to create a sham fact issue, including whether "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Knitter*, 758 F.3d at 1218 n.3 (citation omitted).

The threshold requirement of a direct contradiction between deposition testimony and an affidavit is met in this case. D.C. clearly testified that his job at El Matador ended around the time of his second hospitalization. But his later declaration claims that Jennifer fired him at a later date. Thus, this court must weigh the three factors in determining whether the contradictory affidavit constitutes an attempt to create a sham fact issue. The first consideration disfavors the exclusion of D.C.'s declaration. Although his attorney was present, plaintiff's counsel did not cross-examine him during the deposition. The second and third considerations, however, weigh heavily in favor of deeming a portion of the declaration to be a sham affidavit. As D.C. was giving testimony as a percipient witness to the timing of his separation from El Matador, he had access to all pertinent evidence when he testified in the deposition. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (concluding that an affidavit created only a sham issue of fact because the deponent, "as a participant in the alleged conversations . . . clearly had access to the relevant evidence at" the time of the deposition). Nor was the declaration based upon newly discovered evidence. Moreover, the declaration does not attempt to clarify an ambiguity or confusion in the deposition testimony.

Balancing these three considerations, the court finds that D.C.'s declaration creates only a sham issue of fact. The court, therefore, disregards the portion of D.C.'s affidavit in which he

declares that Jennifer constructively fired him after he cooperated with the police investigation. Absent any other evidence that El Matador subjected D.C. to an adverse employment action subsequent to a protected activity, there can be no proof of causation. Therefore, El Matador is entitled to summary judgment on D.C.'s retaliation claim.

## III.     Wrongful Discharge

"An at-will employee whose employment has been terminated in violation of a clear and substantial public policy may sue for wrongful termination." *Ray v. Wal-Mart Stores, Inc.*, 359 P.3d 614, 620 (Utah 2015). The Utah Supreme Court has

> identified four categories of public policies that may provide a basis for a wrongful termination claim: (i) refusing to commit an illegal or wrongful act, such as refusing to violate the antitrust laws; (ii) performing a public obligation, such as accepting jury duty; (iii) exercising a legal right or privilege, such as filing a workers' compensation claim; or (iv) reporting to a public authority criminal activity of the employer.

*Id.* (emphasis removed) (citation omitted).

In his sixth cause of action, D.C. alleges that he was wrongfully terminated (either formally or constructively) for reporting Jennifer's criminal activity in derogation of Utah's public policies. But D.C.'s wrongful termination claim fails as a matter of law for the same reason that his retaliation claim fails. As noted above, there is no competent evidence that El Matador fired D.C. after he reported a crime to the police. Instead, the evidence only supports the proposition that he no longer worked at El Matador by the time that D.C. cooperated in the investigation. There can be no causal connection between his termination and the activity

protected by Utah's public policy—reporting the criminal activity of an employer. El Matador, therefore, is entitled to summary judgment on D.C.'s wrongful termination claim.[8]

## CONCLUSION

The court GRANTS IN PART AND DENIES IN PART the motion for summary judgment filed by defendants El Matador, Inc., El Matador Restaurante & Cantina, and El Matador Restaurant (collectively, El Matador). (Docket 60). Summary judgment is GRANTED to El Matador as to the first cause of action for negligence, sixth cause of action for constructive wrongful discharge, and seventh cause of action for negligent infliction of emotional distress. Summary judgment is also GRANTED to El Matador as to the retaliation claim contained in the fifth cause of action. Summary judgment is DENIED as to the federal hostile working environment claim in the fifth cause of action.

The court GRANTS the motion for summary judgment filed by defendants Tony Hasratian, Paula Hasratian, the Tony Hasratian Living Trust, and the Paula Hasratian Living Trust  (collectively, the Hasratians). (Docket 59). Summary judgment is GRANTED to the Hasratians as to the first cause of action for negligence and the seventh cause of action for negligent infliction of emotional distress.

---

[8] D.C. captioned his sixth cause of action as follows: "Constructive Wrongful Discharge and Breach of the Covenant of Good Faith and Fair Dealing." But underneath this caption, D.C. does not allege any facts relevant to a breach of the covenant of good faith and fair dealing claim, nor does he even mention such a claim. D.C.'s inclusion of a phrase in the title to a cause of action is insufficient to raise an independent claim as there are no assertions of fact to support the claim. Because D.C. only pled a wrongful termination claim under his sixth cause of action, it shall be dismissed in its entirety.

Therefore, the causes of action that remain in this case include all of the claims pled against Jenifer Hasratian and the federal and state law hostile work environment claims pled against El Matador.

Signed October 25, 2016.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge